## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 1:21-cr-20167-JLK/Becerra

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**DUSTIN LEE MAYES,**

      **Defendant.**

_____/

### REPORT AND RECOMMENDATION[1] ON DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS

**THIS CAUSE** came before the Court on Defendant, Dustin Lee Mayes' ("Defendant"), Motion to Suppress Physical Evidence and Statements (the "Motion"). ECF No. [29].  The United States of America (the "Government") filed a Response to Defendant's Motion, ECF No. [37], and the Court held an evidentiary hearing on this matter, ECF No. [40].  Upon due consideration of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby **RECOMMENDED** that Defendant's Motion be **GRANTED**.

---

[1] The Honorable James Lawrence King, Senior United States District Judge, referred this matter to the undersigned "for all such judicial proceedings as are permissible under the Magistrate's Act and the Rules of Court for the Southern District of Florida."  ECF No. [30].

## I.      BACKGROUND

Defendant is charged in a one-count Indictment with knowingly possessing a firearm and ammunition after having been previously convicted of a felony, in violation of Title 18, United States Code, Section 922(g)(1).  ECF No. [1].  As described in more detail below, Miami Springs Police Department Officers responded to a 911 call reporting that shots were fired into the air outside of the Runway Inn in Miami Springs.  The caller described the shooter as a Black male wearing a yellow highlighter shirt and blue jeans, and reported that the suspect was still at the hotel.

Once the officers arrived at the Runway Inn, they met with a witness who told them that the shooter had fled in a gray Ford SUV.  Information about the suspect car was transmitted on the police radio.  While responding to the scene of the shooting, another officer heard on the police radio that the suspect had fled in a gray SUV.  Within minutes of hearing that on the police radio, the officer saw a gray SUV on the road heading away from the Runway Inn.  The officer turned around, pursued, and later stopped the car.  The occupants of the car were removed and handcuffed.  Defendant was a passenger in the vehicle.  Following a search of the car, the officers recovered a 9mm handgun and 9mm cartridges.  After his arrest, Defendant made incriminating statements to law enforcement.

Defendant now files the instant Motion which seeks to suppress the firearm that was recovered, as well as the statements he made to law enforcement.  *See* ECF No. [29].  First, Defendant contends that, based on the totality of the circumstances, all evidence obtained pursuant to the stop and seizure should be suppressed.  *Id.* at 3–4.  Specifically, Defendant argues that the Miami Springs police officer that conducted the stop lacked reasonable

2

suspicion because the only description he had of the car or its occupants was that the car was gray.  *Id.* at 4.  Second, Defendant argues that any statements by Defendant following the stop and seizure must be suppressed because the officers conducted a custodial interrogation without reading Defendant his *Miranda* rights, or alternatively, if Defendant was read his *Miranda* rights, Defendant did not knowingly, intelligently, and voluntarily waive those rights.  *Id.* at 5–6.

In response, the Government argues that Defendant's Motion should be denied because the firearm was properly seized, and Defendant verbally waived his *Miranda* rights after they were read to him.  ECF No. [37] at 1.  Specifically, the Government argues that a civilian on the scene told the officer that the shooter departed in a "gray Ford SUV," and that the officer that conducted the stop of the car observed a car matching that description a short distance from the location of the shooting, minutes after the civilian reported it to the officers.  *Id.* at 1–3.  Second, the Government argues that Defendant was "verbally advised" of his *Miranda* rights, and that Defendant knowingly, intelligently, and voluntarily waived his rights prior to making incriminating statements.  *Id.* at 3.

At the evidentiary hearing, the Government called three witnesses, Officer Seth Jordan, Officer Rafael Dominguez, and Ms. Tracy Michael, all of Miami Springs Police Department, and each of whom were subject to direct and cross-examination.  The Government also introduced into evidence: (1) a map marked with the location of the Runway Inn, and the location where the vehicle was stopped, Govt. Ex. 1, ECF No. [41-1]; (2) Defendant's booking photo, Govt. Ex. 2, ECF No. [41-2]; (3) an audio recording of 911 calls from the night of the shooting, Govt. Ex. 3, ECF No. [41-3]; and (4) a dispatch

3

radio channel recording from the night of the shooting, Govt. Ex. 4, ECF No. [41-4]. Defendant introduced into evidence the Communications Event Report, Df. Ex. A, *see* ECF No. [43].

## II.     FINDINGS OF FACT

Based on the testimony of the witnesses noted below, who the Court finds credible, and the exhibits entered into the record, the Court concludes as follows.

### A.  Testimony of Officer Jordan

At approximately 3:00 a.m. on May 25, 2020, Officer Seth Jordan (who at the time had only been with the Miami Springs Police Department for about a year and four months) was dispatched to the Runway Inn, located at East Drive and Northwest 36th Street.  *See* ECF No. [41-1].  According to Officer Jordan, a 911 caller reported a shooting at the Runway Inn, describing the shooter as a Black male with a yellow shirt and blue jeans. Officer Jordan testified that he did not know who had made the 911 call.  Officer Jordan met with other officers a couple blocks away from the Runway Inn to ensure that they had their bullet proof vests on before they approached the Runway Inn.

Upon arriving at the Runway Inn, a witness ran out and, pointing eastward, told Officer Jordan that the shooter had fled in a gray, Ford SUV.  The witness did not provide any other information concerning the shooter, the car, or the occupants of the vehicle. There was no testimony offered as to when the shooter left the hotel.

Officer Jordan testified that he believed the information about the vehicle (gray Ford SUV) was transmitted over radio, but he did not recall who transmitted the information, nor could he recall whether he heard the information over the police radio.

According to Officer Jordan, after information about the car went out over the radio, officers began canvassing the area for a vehicle based on the witness' description. Officer Jordan testified that a fellow officer, Officer Rafael Dominguez, located a gray Ford Expedition "[w]ithin minutes. Less than ten." ECF No. [46] at 19:22.

After hearing that Officer Dominguez had stopped a vehicle, Officer Jordan went to the location of the stop and saw the occupants, including Defendant, being removed from the car. Defendant was wearing a "highlighter shirt and blue jeans." *Id.* at 20:17. Officer Jordan was not involved with the search of the vehicle. Although Officer Jordan did not question Defendant at that time, he later learned that Sergeant Vargas read Defendant his *Miranda* warnings at the scene of the stop. Officers transported Defendant back to the Runway Inn, and the other occupants of the car were released.

When they returned to the Runway Inn, Officer Jordan read Defendant his *Miranda* warnings, verbatim, by card. Defendant agreed to speak with Officer Jordan and told him that he had taken the gun out of the hotel room and went outside and started shooting because he was upset. The statement was not recorded, and Officer Jordan did not ask Defendant about his education, mental health history, or whether he was under the influence of drugs or alcohol.

### B. Testimony of Officer Rafael Dominguez

Officer Rafael Dominguez was working the midnight shift on May 25, 2020, when he heard the dispatcher advise that there had been a shooting at the Runway Inn. During that first radio call, Officer Dominguez heard a description of the suspect. Officer Dominguez first stopped to put on his bullet-proof vest, and then began driving toward the

Runway Inn.  On his way to the Runway Inn, Officer Dominguez received a BOLO over the police radio that the possible subject was fleeing in "a gray SUV."  According to Officer Dominguez, he did not have any other information about the car.

Approximately one minute after hearing the radio description of the car, Officer Dominguez, traveling Westbound toward the Runway Inn, saw a gray car that he believed was a Jeep.  Officer Dominguez testified that the gray Jeep had just exited East Drive, and was then going eastbound on 36th Street, the opposite direction that Officer Dominguez was traveling.  According to Officer Dominguez, he made a U-turn and attempted to catch up to the car.  Officer Dominguez testified that he initially was not close enough to see the exact make and model of the car but advised other officers on his police radio that he was traveling eastbound on Northwest 36th Street behind a gray Jeep.  Officer Dominguez testified that, from the back, both a Jeep and a Ford SUV have a square body frame.  Officer Dominguez could not see any of the individuals inside the car while he was following it.  Officer Dominguez testified that he followed the Jeep for approximately three to four minutes.  As Officer Dominguez came closer to it, he was able to identify it as a gray Ford SUV, called out the tag on the radio, and waited for backup officers to perform a felony stop on the vehicle.  According to Officer Dominguez, he did not see any other gray cars, nor any other SUVs on the road while heading toward the Runway Inn.

Officer Dominguez and the other officers eventually stopped the car on State Road 112.  After stopping the car, the occupants were asked to step out.  Defendant was the passenger in the rear right.  Officer Dominguez described Defendant as wearing a green/yellow highlighter shirt with blue jeans.  For officer safety, all passengers were

6

detained and placed in handcuffs while the officers conducted their investigation.  Officer Dominguez recovered a firearm from the car.

After officers recovered the gun, Officer Dominguez drove Defendant back to the Runway Inn.  Although Officer Dominguez did not hear Defendant make any statements, he did hear Officer Jordan begin to read Defendant his *Miranda* rights.

### C.  Testimony of Tracy Michael

Tracy Michael has been a communications supervisor for the Miami Springs Police Department for seven years.  Ms. Michael testified that although the radio frequency recording of that evening includes a lot of static, it also contains phone calls of witnesses calling to report shootings or gun fire, as well as officers responding, preparing, and arriving at the scene of the shooting.  According to Ms. Michael, it is possible for static to cover over a communication that was transmitted on the radio channel, which could result in an officer not being able to hear the communication, or that the communication was heard but simply not picked up on the recording.  Ms. Michael recalled that there were issues with the recording system specifically around May 2020.

### D.  The Exhibits and Recordings

First, the Government admitted into evidence a map of the area where the incident occurred, depicting the route and distance (two miles) from the Runway Inn to the location where the car was eventually stopped.  *See* Govt. Ex. 1, ECF No. [41-1].  Second, the Government also admitted Defendant's photo and booking information from the date of the arrest.  *See* Govt. Ex. 2, ECF No. [41-2].  Finally, the Government also admitted two

recordings: a 911 call tape, *see* Govt. Ex. 3, ECF No. [41-3], and a tape of the police radio frequency from the evening, *see* Govt. Ex. 4, ECF No. [41-4].

The 911 tape contained a call from the Runway Inn where the caller advised that shots were fired, a call from a neighbor alerting the same, and a call from a police dispatcher to the Runway Inn where the dispatcher asks the person who appeared to be working at the front desk to stay on the line. As to the last portion of the 911 tape, the hotel employee tells the police dispatcher that he is moving locations because he is being told that the suspect is coming down the hall. Approximately two minutes after the hotel employee says he is moving locations to avoid being seen by the suspect, the 911 recording (which recorded the radio transmission in the background) picks up Officer Dominguez telling the dispatcher that he sees a vehicle. The police radio recording is an hour long, however, it contains an approximate seven-minute interval between a call to all units to prepare to respond to the shooting and Officer Dominguez locating the vehicle. Neither the police radio recording nor the 911 recording, however, contained the BOLO that had the description of the car.

Additionally, Defendant admitted the Communications Event Report. *See* Df. Ex. A, ECF No. [43]. No testimony about the report was elicited, although it should be noted that it appears to summarize some of the radio transmissions that evening. No information about a gray Ford SUV heading eastbound is noted on the report. Instead, there is a notation that units were advised "that the male possibly left in a gr[a]y Jeep," and seconds after that, a Florida tag was noted. Whether that notation reflects the BOLO or the information that Officer Dominguez radioed after he saw the vehicle is not clear.

### III.   ANALYSIS

#### A.  Officer Dominguez Lacked Reasonable Suspicion To Stop The Car In Which Defendant Was A Passenger.

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause.'"  *United States v. Batson*, 749 Fed. Appx. 804, 806 (11th Cir. 2018) (quoting U.S. Const. amend. IV).  "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990)).

A seizure under the Fourth Amendment occurs when law enforcement stops a vehicle.  *United States v. Jones*, 827 Fed. Appx. 946, 948 (11th Cir. 2020) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)).  In certain circumstances, however, law enforcement may conduct a stop, absent probable cause, without running afoul of the Fourth Amendment.  *United States v. Hensley*, 469 U.S. 221, 226 (1985); *see also Terry v. Ohio*, 392 U.S. 1 (1968).  Specifically, "[l]aw enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity."  *Jones*, 827 Fed. Appx. at 948 (quoting *Hensley*, 469 U.S. at 226).  Whether an officer has reasonable suspicion to conduct a stop depends on "'the totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

9

"Reasonable suspicion is 'considerably less than proof of wrongdoing by a preponderance of the evidence' and less than probable cause." *Jones*, 827 Fed. Appx. at 948 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  Nevertheless, there must be a "minimal, particularized, and objective justification for the stop." *Id.*

The question before the Court is whether Officer Dominguez had reasonable suspicion to stop the car in which Defendant was a passenger.  Although Defendant challenges whether information about the car was ever broadcast on the radio and notes the lack of evidence to support that testimony, the Court credits Officer Dominguez's testimony that he did receive information over the radio, specifically, that the suspect was in a gray SUV.[2]  However, the Court finds that the Officer had no other information about the make of the car.  Indeed, although Officer Jordan testified that the witness also gave the make of the car, a Ford, Officer Jordan did not recall hearing what information was put on the radio, nor could he recall who put that information on the radio.  On this record, the Court cannot conclude that that information was even transmitted on the police radio.[3]  In

---

[2] Although the Government argued at the hearing that Officer Dominguez likely heard more information from the radio call, including the make of the car (a Ford), there is no evidence from which the Court can make that inference as the Government did not ask Officer Dominguez whether it was possible that he heard more information that night yet simply could not recall.

[3] Defendant also challenged whether Officer Dominguez was even looking for a gray Ford SUV as opposed to a gray Jeep.  Although Officer Dominguez testified that he initially referred to the car as a gray Jeep, he testified that the BOLO he heard was for a "gray SUV," and that as he got closer to the vehicle, he was able to identify it as a "gray Ford SUV."  He also testified that a Jeep and an SUV have a similar look.  The fact that Officer Dominguez first identified the car as a Jeep is not particularly relevant, given that his testimony was that he was looking for an SUV, he believed that a Jeep fit that description, and that before he stopped the car, he recognized it was an SUV and not a Jeep.

addition, although Officer Jordan testified that the witness told him that the car was traveling eastbound, the record does not support a finding that that information (the direction the car was traveling in) was ever relayed on the radio, nor does Officer Jordan's testimony even suggest it.[4]  Given that there is little evidence of what information was actually relayed on the police radio, the Court is guided by the testimony of Officer Dominguez—who the Court finds credible—that he was looking for the suspect in, specifically, a gray SUV.  Moreover, Officer Dominguez had no information about the number of occupants in the car, nor had the car committed any traffic violations.  Finally, although Officer Dominguez testified that he saw the car within minutes of hearing the BOLO, the amount of time between the suspect leaving the Runway Inn and when Officer Dominguez saw the car is not known.

For the reasons below, the Court finds that Officer Dominguez lacked particularized, objective justification for the stop.  Specifically, the stop was based on the color and the type of car (an SUV) which, as discussed below, is simply not sufficient under the totality of circumstances.  Indeed, as to the car, Officer Dominguez did not know the make of the car, the year, the number of occupants, the direction the car was traveling, nor the time the car left the hotel.  Moreover, in the time he followed the car, there was nothing about how the car was being driven that could have aroused any suspicion.  Finally, although Officer Dominguez saw the car a few blocks from the hotel soon after he heard

---

[4]  In any event, it does not appear that the car would have been traveling eastbound when Officer Dominguez first saw it, as he testified that the car was three to four blocks from the Runway Inn, exiting East Drive and then went eastbound on 36th Street.

the BOLO, the time frame between when the suspect left the hotel and when the car was first seen is unknown.

Several cases from this Circuit support the undersigned's Recommendation.  For example, in *Jones*, the officer was responding to a police radio call concerning a shooting, and while on his way to the site of the shooting, the officer passed a gray vehicle driving recklessly.  827 Fed. Appx. at 947.  Upon arriving at the shooting cite, an agent informed the officer that a silver or gray vehicle had fled the direction of the shooting site.  *Id.*  The agent also told the officer that the vehicle's license plate had a "J," and that the driver was a Black male who appeared animated.  *Id.*  The officer suspected the vehicle may be the same that he had passed earlier, and he began to canvass the area in search of the vehicle. *Id.*  While searching, the officer encountered the vehicle passing him.  *Id.*  The officer turned around to initiate a traffic stop, noticed that the license plate contained a "J," and observed the driver, who had a "deer in the headlights" expression, toss what appeared to be a white paper out of the window.  *Id.*  Looking at the totality of the circumstances, the Eleventh Circuit found the officer had enough information to support reasonable suspicion because: (1) he knew there had been a shooting at the site, (2) the agent had "witnessed a gray vehicle driving erratically from the direction of the" shooting site, (3) the officer observed what he believed to be the same vehicle "driving erratically in a high crime area," and (4) the vehicle that the officer stopped matched the description provided by the agent. *Id.* at 949.  Here, in stark contrast to *Jones*, there was no description of the occupants of the vehicle, no description as to the tag or any other feature to distinguish the gray car, and no evidence that the car was driving in any manner to arouse suspicion.

In *United States v. Webster*, the specificity of a BOLO for a car was also addressed. 314 Fed. Appx. 226 (11th Cir. 2008). There, the Eleventh Circuit found that although the BOLO description of "a dark-colored vehicle with "something to the effect of 'Down South Customs' written on the rear window . . . was far from a model of clarity," the description "sufficiently narrow[ed] the field of suspected vehicles" such that the officer had reasonable suspicion to stop "a blue Pontiac Grand Am with a decal on the rear window [that read] 'Down and Dirty Customs.'" *Id.* at 227–29. Here, unlike the officers in *Webster*, Officer Dominguez had no information about the car that would narrow the field of gray SUVs, a description that is clearly quite broad.

Likewise, in *United States v. McCall*, the Eleventh Circuit held that there was reasonable suspicion where officers received a dispatch report regarding a "white 2011 Charger vehicle stolen by three black men." 563 Fed. Appx. 696, 700 (11th Cir. 2014). The vehicle that was stopped, a few miles from the scene of the crime, was of "the same make, model, color, and year" and contained "multiple" occupants. *Id.* Here, Officer Dominguez had far less information concerning the vehicle—only color and size—and knew nothing about the occupants. *See also United States v. Johnson*, 192 F. App'x 935, 938 (11th Cir. 2006) (finding reasonable suspicion where the BOLO was "issued for two black males in a white Malibu, and the car, which matched that description, was stopped approximately 1.7 miles from the bank where the robbery had occurred"); *United States v. Price*, CR 106-081, 2007 WL 430745, at *5 (S.D. Ga. Feb. 7, 2007), *aff'd in part,* 298 F. App'x 931 (11th Cir. 2008) (finding reasonable suspicion where "the deputy knew the color, type, and virtually the exact location of the suspect car, including the direction in

which the car was heading"); *United States v. Frage*, No. 21-CR-60099-RAR, 2021 WL 4876119, at *4–5 (S.D. Fla. Oct. 4, 2021), *report and recommendation adopted*, No. 21-CR-60099-RAR, 2021 WL 4866315 (S.D. Fla. Oct. 19, 2021) (finding reasonable suspicion where an officer heard a BOLO identifying the color, make, and location of the vehicle along with a description of the driver's suspicious activity and the officer stopped a vehicle matching the description, at the location that was provided in the BOLO, within three minutes of the BOLO, and after witnessing driver's activity which matched the description provided by the BOLO).[5]

Although the Government did not, either in its Response or in its argument at the evidentiary hearing, offer any case law beyond *Terry* in support of its position, Defendant cites to *United States v. Jaquez*, 421 F.3d 338 (5th Cir. 2005), a case with very similar facts and which the undersigned finds persuasive. In *Jaquez*, the officers, much like Officer Dominguez here, responded to reports of "shots fired." *Id.* at 340. The officer who conducted the stop "knew only that 'a red vehicle' had been involved in a reported incident approximately 15 minutes earlier, in the same general area where she first spotted the car . . . [and] . . . did not have any particular information about the vehicle, such as its make or model, or any description of its occupant(s)." *Id.* at 341. In addition to these factors, the

---

[5] There was also a dispute regarding the color of the suspect's shirt. Officer Jordan testified that the witness that called 911 reported that the shooter was wearing a yellow shirt, but after seeing Defendant, Officer Jordan felt the shirt was more of a green, and so he wrote "green shirt" on the arrest form. The issue is not particularly relevant to the reasonable suspicion analysis as Officer Dominguez was not relying on any description of the occupants of the vehicle for the stop.

officer stopped the defendant because it was night-time and a high-crime area. *Id.* at 340. The Fifth Circuit found this "insufficient to support reasonable suspicion" because the officer knew that the vehicle was red but did not know any other facts concerning the vehicle or occupants. *Id.* at 341. Here, too, Officer Dominguez only knew he was looking for a "gray SUV," and like the officer in *Jaquez*, stopped the car because it was in the area.[6]

Finally, the fact that the vehicle was located a short distance from the Runway Inn within minutes of the BOLO is not, at least on these facts, sufficient to favor a finding of reasonable suspicion. Indeed, the fact that the car was near the vicinity of the shooting is not particularly persuasive unless the time between the suspect leaving in the car and Officer Dominguez locating the vehicle supports the suspicion that the car that was stopped could have been the one that left the location of the shooting. *See United States v. Bolden*, 508 F.3d 204, 206 (5th Cir. 2007) (noting that "[i]n *Jaquez,* more than fifteen minutes had passed. In that amount of time, a car can take a shooter many miles away from the scene of violence, so merely driving a red car in the relative vicinity of the shooting was not enough."). For instance, in *United States v. Williams*, an officer was parked outside of a public housing project when he heard a gunshot at 1:30 a.m. 619 F.3d 1269, 1270 (11th Cir. 2010). The officer had worked in the high-crime area for two years. *Id.* Seconds after hearing the gunshot, the officer saw a car quickly leave from one of the project's exits and

---

[6] The fact that Officer Dominguez saw no other SUVs that night, a point raised by the Government, is not particularly helpful given that only a minute passed from the time he heard the BOLO to the time he saw the car. Also, the color and style of car are common. To be sure, if the car he was looking for was a neon pink pickup truck and that was the only one he saw that night, perhaps the argument would have more weight.

stopped the car.  *Id.*  The Eleventh Circuit determined that "it was eminently reasonable" to be suspicious that the occupants of that car may have been involved in criminal activity. *Id.* at 1271.  Specifically, it was reasonable for the officer to stop the first and only car he saw given that it was speeding out of the community within seconds of the gunshot.

Of course, that is not the evidence in this case.  Although the car was driving away from the hotel, the shooting had not just taken place, nor was the car driving in a manner that would arouse suspicion.  *See Bolden*, 508 F.3d at 205 (time between the shots and the stop was less than one minute and the car was coming at the officers at a "relatively fast pace").  Moreover, although Officer Dominguez saw the vehicle within minutes of hearing the BOLO, the time between the BOLO and the stop is not the relevant inquiry.  The relevant inquiry is the time between when the suspect left the hotel and the identification of the car by Officer Dominguez.  Even if one assumes that the time between the witness providing the information and the BOLO is short, the Government concedes "that there is no way to know, nor is there evidence on exactly how much time after the defendant departed in that car and when the witness gave that description.  We have no way of knowing that."  ECF No. [104] at 104:7–10.[7]  In addition, because the officers went to a

---

[7] In the 911 recording, the time frame between the front desk clerk stating that someone told him that the suspect was leaving and Officer Dominguez advising that he sees a car is short, approximately two minutes.  However, if you assume that the suspect was still in the hotel when the front desk clerk suggests that he is there, the suspect would have left the hotel, gotten into the car with three others, the police would have arrived without seeing the car leave, the police would have spoken to the witness, the BOLO would have been put on the radio (and yet not be captured on the recording although the other parts of the police radio were captured in the background), and the car would have been spotted by Officer Dominguez *all in less than two minutes*, and yet the car would have only been two or three blocks away.  Indeed, such a time frame would weigh heavily in favor of Defendant's

different location to secure their vests after receiving the call about the shooting, the Court cannot reliably estimate when they arrived at the hotel based on the recordings provided.[8] As Defense counsel argued at the hearing, the time might actually work against the Government's theory, as the car would certainly be further than three or four blocks from the hotel if there had been time for the officers to arrive, get the statement from the witness, put it out on the radio, and then have at least another minute pass before Officer Dominguez saw the car. To be sure, the time and vicinity of the stop is not irrelevant, it simply is not enough, given that the information regarding the car is so limited, to rise to the level of reasonable suspicion.

Here, the totality of the circumstances demonstrates that there was not reasonable suspicion to stop the vehicle in which Defendant was a passenger. Given the analysis in *Jaquez* and the cases in this Circuit, the lack of other particularized information about the vehicle (make or year of the car, markings on the car, number of occupants, description of

---

theory that no BOLO was put on the radio that night and that Officer Dominguez simply stopped the first car he saw on his way to the location of the shooting. Instead, if the officers are credible, and the Court finds that they are, then the front desk clerk (who appears to be relaying what others are telling him) could not be correct when he stated that the suspect had not yet left.

[8] Although the time between when the shooting was reported and the time the car was first seen by Officer Dominguez is helpful, the evidence in this record on that point is not particularly clear. Specifically, Officer Jordan testified that the first call regarding the shooting was at approximately 3:00 am, and that the car was stopped around 4:00 am, making the time frame as long as one hour. The 911 recording is a little over ten minutes long but appears to be various snippets, and has empty gaps suggesting that it is not a continuous recording. The police radio recording sets the time frame between the call to the police that there was a shooting and the stop of the vehicle within seven to eight minutes. However, the tape is not only entirely silent with respect to the BOLO, it is also silent with respect to when the officers arrived at the Runway Inn.

occupants) or any other indicia that would have raised the officer's suspicion (furtive gestures by the driver, reckless driving), the undersigned finds that Officer Dominguez lacked reasonable suspicion to stop the car.    Accordingly, the undersigned **RECOMMENDS** that the firearm, ammunition, and Defendant's statement to police be suppressed as products of an unlawful search and seizure.

### B.  Defendant's Statement Did Not Violate The Fifth Amendment.

Should the District Court not adopt the undersigned's reasoning as to the stop of the car, the undersigned separately analyzes Defendant's Fifth Amendment *Miranda* claim.

"*Miranda* protects a person's Fifth Amendment privilege against self-incrimination" but an individual may waive that right, "provided the waiver is made voluntarily, knowingly and intelligently." *United States v. Espinoza*, 635 Fed. Appx. 739, 748 (11th Cir. 2015) (quoting *Miranda v. Arizona,* 384 U.S. 436, 444 (1966)).  It is the Government's burden to prove a defendant's waiver by a preponderance of the evidence, taking into account the totality of the circumstances.  *Id.*  First, in order to be voluntary, the waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (citing *Moran v. Burbine,* 475 U.S. 412, 421 (1986)).  Second, a *Miranda* waiver is knowingly made when "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (citing *Moran*, 475 U.S. at 421).  This voluntariness inquiry focuses "on whether the police overreached, considering factors such as the [accused's] lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of

detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Id.* (citing *Moran*, 475 U.S. at 421).

Although a "signed *Miranda* waiver is usually strong evidence that the defendant waived his rights, . . . it is not necessary." *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010) (citing *North Carolina v. Butler,* 441 U.S. 369, 373 (1979)). Accordingly, "failing to obtain a signed *Miranda* waiver alone is not proof that the defendant did not freely and intelligently waive his rights" but rather is "one of the pieces of evidence the court considers in determining whether the Government has proved by a preponderance of the evidence that the defendant voluntarily waived his rights." *Id.* In evaluating the validity of a *Miranda* waiver, a court may credit one witness' testimony over another. *See Espinoza*, 635 Fed. Appx. at 748 (citing *United States v. Ndiaye*, 434 F.3d 1270, 1305 (11th Cir.2006)) ("The district court's choice between two plausible views of the evidence cannot be clear error.").

Officer Jordan testified that Defendant received *Miranda* warnings before making any incriminating statements, and the undersigned credits that testimony. Specifically, Officer Jordan testified that he read Defendant his *Miranda* warnings, verbatim by card, after arriving back at the Runway Inn. Although Officer Jordan did not present Defendant with a written waiver, the absence of a signed *Miranda* waiver is not determinative, but rather is merely one factor for the Court to evaluate. *See Bernal-Benitez*, 594 F.3d at 1319. Indeed, Officer Jordan testified that Defendant verbally waived his *Miranda* rights and agreed to speak with Officer Jordan before Officer Jordan began questioning. *See United States v. Beckles*, 565 F.3d 832, 840 (11th Cir. 2009) (citing *United States v. Delancy,* 502

F.3d 1297, 1308 (11th Cir. 2007) (concluding that the district court did not err in denying motion to suppress after finding defendant voluntarily, knowingly, and intelligently waived *Miranda* rights where the Government and defense presented contradictory testimony and "the district court made a detailed credibility determination in favor of the FBI agent's version of the events"). Moreover, although Officer Jordan did not record the waiver or interrogation, such a recording is not required by the Constitution. *See United States v. Boston*, 249 Fed. Appx. 807, 810 (11th Cir. 2007) ("Although a rule requiring the government to record statements made during custodial interrogations might be sound policy, we agree with other circuits that have concluded that the Constitution does not require us to adopt such a rule.").

Finally, Officer Jordan testified on cross examination that he did not believe Defendant's appearance that night suggested that Defendant was under the influence. In addition, the Fifth Amendment does not require Officer Jordan to ask Defendant about his education, mental health history, or whether he was under the influence of drugs or alcohol before obtaining a waiver. *See Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992) (finding voluntary waiver of *Miranda* rights over defendant's argument "that his mental impairment and his alcohol and drug consumption prevented a voluntary and knowing waiver" because "*Miranda* is about coercion" and neither defendant's allegations nor review of the record showed "any instance of state coercion"). Accordingly, the undersigned finds that, should the District Court proceed to analyze the statements made by Defendant, Defendant knowingly and voluntarily waived his *Miranda* rights after Officer Jordan read them to him.

## IV.     CONCLUSION

For the reasons stated at the hearing and as set forth above, it is hereby **RECOMMENDED** that Defendant's Motion to Suppress, ECF No. [29], be **GRANTED** on the grounds that the seizure violated Defendant's Fourth Amendment rights.

## V.      OBJECTIONS

A party shall serve and file written objections, if any, to this Report and Recommendation with the United States District Judge for the Southern District of Florida, within **SEVEN** calendar days of being served with the Report and Recommendation.  Any response to another party's objections must be filed within **THREE** days after being served with a copy thereof.  Any request for an extension of these deadlines must be made within **THREE** calendar days from being served with the Report and Recommendation.  The parties were given ample time to argue their positions at the hearing, and the shortened period will allow for the District Court to consider the matter before the Calendar Call now set for February 10, 2022.  Pursuant to Fed. R. Crim. P. 59(b), Eleventh Circuit Rule 3-1, and accompanying Internal Operating Procedure 3, the parties are hereby notified that failure to object in accordance with 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, on January 23, 2022.

_____
**JACQUELINE BECERRA**
**UNITED STATES MAGISTRATE JUDGE**

21